UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION


TERRANCE P. SOLES,

     Petitioner,

v.                               Case No. 3:22cv1914-LC-HTC

RICKY D. DIXON,

     Respondent.

_____/

## REPORT AND RECOMMENDATION

Petitioner, Terrance P. Soles, *pro se*, filed a petition under 28 U.S.C. § 2254, challenging his conviction for second-degree murder in Case Number 2014 CF 4998 in the First Judicial Circuit for Escambia County. Doc. 1. After considering the petition, the record, the state's response, Doc. 7, and Petitioner's Reply, Doc. 11,[1] the undersigned recommends the petition be DENIED without an evidentiary hearing.

---

[1] Petitioner addresses only Ground One in his reply.

## I.  BACKGROUND

### A.  Offense and Conviction

Petitioner is serving a 40-year sentence for second-degree murder in the shooting death of his friend, Skky Shine.  Doc. 7-1 at 133.  The facts and evidence presented at trial were as follows:

Around 8:00 PM on November 9, 2014, Petitioner and Shine drove from Pensacola to Robertsdale, Alabama, to visit friends.  Doc. 7-3 at 196.  While there, sometime after 12:30 AM the next morning, Petitioner's mother called his cell phone, informing him that her backdoor alarm kept going off.  *Id.* at 168; 96-97.  The two then discussed Petitioner picking his dad up the next day from a medical appointment when the alarm went off again during the call, at which point, Petitioner told his mother he would come over.  *Id.* at 169.  Then the phone went dead, and, despite repeated attempts to call him back, Petitioner's mother was not able to reach him again.  *Id.*

After speaking to his mother, Petitioner also called his brother, John, around 1:00 AM and asked him to check on their mother's home because somebody may be trying to break into the home.  *Id.* at 181.  John checked on his mother, concluded

all was well, and left.  *Id.* at 182.  John also tried to call Petitioner back but, like his mother, never reached him.[2]  *Id.*

Petitioner also immediately left Robertsdale for his mother's home, driving at a speed of 90 to 100 mph, with Shine in the passenger's seat.  *Id.* at 197-98.  About 10-15 minutes into the drive, Petitioner called 911 because he did not think his mother and brother were answering his questions directly and was under the impression someone might be with them, holding them hostage.  *Id.* at 200-01.

In the first call, made at approximately 1:30 AM, *id.* at 36, Petitioner gave the dispatcher his mother's address and told them they needed to send the police.  Doc. 7-3 at 26 & 41-43.  Shine can be heard in the background saying, "Don't shoot me man."  *Id.* at 24, 244.  The call dropped after a few seconds.  *Id.* at 42-43.  During the second call, three minutes later, *id.* at 37, Petitioner said, "I believe someone home invaded my mom.  I had a friend that I know is a known gang member, and I took him to my mother's house."  *Id.* at 43.  The dispatcher patched in the Escambia County Sheriff's office, and Petitioner continued, "It's a real emergency.  I believe they may have injured my family, ma'am – or my mom, my stepfather, and my brother and my brother's girlfriend."  *Id*. at 44.  Petitioner asked for an ambulance and told the dispatchers the name of his friend -- who was the known gang member

---

[2] John's testimony differs from that of the Petitioner's because Petitioner said John called him back, that they spoke again, and John told him nothing was going on at their mother's house and seemed "distant or frustrated."  Doc. 7-3 at 199; 212-13.

-- was Shine, and that he took Shine to his mom's house and believed "they" did a home invasion. *Id.* at 45. He told dispatchers his name and that he believed there are four or five people who were hurt and several who had invaded the house and who were trying to get away. *Id.*

Petitioner told the dispatchers he thought "they" were holding his mom hostage. *Id.* at 48. He explained that he and Shine used to hang out, that he took Shine to meet a girl, and Shine didn't feel comfortable. *Id.* at 49. He thought Shine called people to go to his mom's house. *Id.* With dispatchers still on the phone, Petitioner said he was almost at the house, and the dispatchers told Petitioner officers were on the way but were originally sent to the wrong address because Petitioner had hung up during the earlier calls. *Id.* at 50. Then, Petitioner said, "We going through it here in the car, and I – I – I – I shot him. I hope he's okay, but ---" *Id*.

Police arrived at the mother's home just as Petitioner did, and Petitioner flashed his lights to get the deputy's attention. *Id.* at 52. When the deputy approached, Petitioner put his hands out the window, told the deputy a gun was on his lap, and asked the deputy to remove it. *Id.* The deputy saw Shine in the passenger's seat, unconscious, with a bullet hole in his left ear. *Id.* at 53. The medical examiner testified at trial that the gun was within two inches of the victim's head when fired, *Id.* at 151, and that the bullet traveled from the left ear of the victim, through his brain and out just above the right ear. *Id.* at 148.

According to Petitioner, however, the shooting was accidental. While Petitioner was talking to 911, Shine said "this Nigga's the law or something like that," and had his hands in his pocket. *Id.* at 201. Petitioner grabbed his firearm and asked Shine to put his hands on the dashboard because he thought Shine had his own weapon in his jacket. *Id.* Shine took his seat belt off and complied, then Shine hit the firearm, resulting in Petitioner asking him to put his hands back on the dash and remain that way. *Id.* at 202. Shine complied and started apologizing to Petitioner, which did not make sense to Petitioner. *Id.* at 203-04. As Petitioner was trying to get off the road, Shine hit the firearm again and it discharged, striking Shine in the head. *Id.* at 204. Although Petitioner had his finger inside the loop of the trigger, he never pulled the trigger and thought the safety was on. *Id.* at 215, 217, 219. After the gun discharged, Petitioner was "in shock" and left the gun on his lap. *Id.* at 200.

### B.    Postconviction History and Timeliness

Petitioner timely appealed his judgment and conviction, and the First District Court of Appeals ("First DCA") affirmed without written opinion (Case No.: 1D16-4165), Doc. 7-6, and denied a motion for rehearing on August 27, 2018. Doc. 7-7. Petitioner did not seek a writ of certiorari in the United States Supreme Court, so his conviction became final the first business day after the ninety days for seeking certiorari expired, or on Monday, November 26, 2018. *See e.g., Bond v. Moore*, 309 F.3d 770, 773–74 (11th Cir. 2002) (holding a state prisoner's conviction becomes

final when the U.S. Supreme Court denies certiorari, issues a decision on the merits, or when the 90-day period to file a petition for certiorari expires).

The AEDPA[3] one-year limit ran for 298 days until Petitioner filed his Motion for Postconviction Relief on September 20, 2019. Doc. 7-8 at 10. That motion tolled the AEDPA limitations period through an amendment, *id.* at 48, its denial, *id.* at 73, and an appeal, 1D20-3089, which resulted in the First DCA affirming without a written opinion. Doc. 7-12 at 3. The mandate was issued on November 29, 2021. *Id.* at 2. The AEDPA limitations period began to run and ran for another 14 days (for a total of 312 days) until Petitioner filed a motion to recall mandate on December 13, 2021.[4] Doc. 7-13. The First DCA denied the motion to recall on December 21, 2021. Doc. 7-14. The AEDPA time ran for 50 days (for a total of 362 days) before

---

[3] Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a petition for habeas relief must be filed within one year of certain trigger dates – the pertinent one here being one year from final judgment. 28 U.S.C. § 2244(d)(1)(A). Properly filed post-conviction motions, such as a motion under Florida Rule of Criminal Procedure 3.850, will toll the limitations period until the motion is fully resolved. *Id.* at § 2244(d)(2).

[4] "[A]s long as the motion is properly filed, a motion to recall the mandate tolls the limitation period." *Allen v. Sec'y, Dep't of Corr.*, No. 4:15-CV-74-MW-GRJ, 2015 WL 8488655, at *5 n.8 (N.D. Fla. Oct. 13, 2015), *report and recommendation adopted,* No. 4:15CV74-MW/CAS, 2015 WL 8493993 (N.D. Fla. Dec. 10, 2015) (citing *Marshall v. Sec'y, Dep't of Corr.,* No. 8:10–cv02366–T–23MAP, 2013 WL 2382291, at *3 (M.D. Fla. May 30, 2013); *Bishop v. Dormire,* 526 F.3d 382–84 (8th Cir. 2008)).

Petitioner filed his federal habeas petition on February 9, 2022. The petition is therefore timely.

## II.   LEGAL STANDARDS

Under the AEDPA, habeas relief may only be granted on a claim adjudicated on the merits in state court if the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). This standard is both mandatory and difficult to meet. *White v. Woodall*, 572 U.S. 415, 419 (2014).

"Clearly established federal law" consists of the governing legal principles set forth in the decisions of the United States Supreme Court when the state court issued its decision. *Id.* A decision is "contrary to" clearly established federal law if the state court either: (1) applied a rule that contradicts the governing law set forth by Supreme Court case law; or (2) reached a different result from the Supreme Court when faced with materially indistinguishable facts. *Ward v. Hall*, 592 F.3d 1144, 1155 (11th Cir. 2010); *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003).

A state court decision involves an "unreasonable application" of Supreme Court precedent if the state court correctly identifies the governing legal principle,

but applies it to the facts of the petitioner's case in an objectively unreasonable manner, *Brown v. Payton*, 544 U.S. 133, 134 (2005); *Bottoson v. Moore*, 234 F.3d 526, 531 (11th Cir. 2000), or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Bottoson*, 234 F.3d at 531 (quoting *Williams v. Taylor*, 529 U.S. 362, 407 (2000)). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fair-minded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011).

Petitioner raises several ineffective assistance of trial counsel ("IATC") claims in the petition. To succeed on an IATC claim, Petitioner must show that (1) counsel's performance during representation fell below an objective standard of reasonableness, and (2) prejudice resulted, *i.e.*, that a reasonable probability exists that but for counsel's unprofessional conduct, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 689 (1984).

The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential. *Id*. The defendant bears the burden of proving that counsel's performance was unreasonable under

prevailing professional norms and that the challenged action was not sound strategy. *Id.* at 688-89.

*Strickland*'s prejudice prong requires a petitioner to allege more than simply that counsel's conduct might have had "some conceivable effect on the outcome of the proceeding." *Id.* at 693. The petitioner must show a reasonable probability exists that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Bare allegations the petitioner was prejudiced by counsel's performance are not enough. *Smith v. White*, 815 F.2d 1401, 1406-07 (11th Cir. 1987).

Finally, because the First DCA affirmed the circuit court's denial of Petitioner's amended 3.850 post-conviction motion without a written opinion, this Court must "look through" that decision to the last related state-court decision that provides a relevant rationale, presume that the unexplained decision adopted the same reasoning and apply the AEDPA deference to that decision. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). Here, the last state court decision providing a rationale for denying Petitioner relief on the grounds raised, when exhausted, comes from the circuit court's September 3, 2020 order denying Petitioner's amended 3.850 motion. Doc. 7-8 at 73.

## III.    DISCUSSION

### A.    Ground One: IATC for Abandoning Viable Insanity Defense

Petitioner argues he had a viable insanity defense because he was delusional at the time he shot the victim and did not know what he was doing.  Doc. 1 at 11. He alleges counsel was ineffective for failing to pursue such a defense, and such failure violated his Sixth and Fourteenth Amendment rights.

Under Florida law, to proceed under the insanity defense, a defendant must show that at the time of the alleged crime, by reason of mental disease or defect, defendant (1) did not know the nature or consequences of his or her act; or (2) is unable to distinguish right from wrong.  *See Patton v. State,* 878 So.2d 368, 374 (Fla. 2004) (discussing); *see also*, Fla. Stat. § 775.027(1) (codifying the common law *M'Naghten* Rule).  Absent such a showing, a defendant is presumed to be sane at the time of the offense.  Fla. Stat. § 775.027(1).

The circuit court determined, however, there was no evidence showing Petitioner would have qualified for an insanity defense.  While Petitioner alleged he suffered delusions[5]; he did not allege a mental infirmity, disease, or defect causing those delusions.  The circuit court further noted that counsel had in fact attempted to find an expert to testify Petitioner was insane but could not find one because "the

---

[5] In closing, counsel argued Petitioner was "delusional" – "thinking things are happening that are not happening," Doc. 7-3 at 263.

facts simply did not support Defendant's present claim that he was legally insane at the time of the offense." Doc. 7-8 at 77. The circuit court denied relief on this claim as being both factually and legally insufficient. *Id.* at 76-77. The undersigned agrees.

In November 2015, the court appointed Dr. Brett Turner to examine Petitioner and assist the defense. Doc. 7-1 at 39. On March 8, 2016, a month before the trial was supposed to take place, defense counsel filed a notice of relying on an insanity defense. Doc. 7-1 at 41. On March 26, 2016, the state moved for a continuance of the trial because Dr. Turner was set to be deposed on March 31, and the state wanted the court to appoint Dr. Benson to assist the State, given the notice of intent to rely on the insanity defense. Doc. 7-2 at 10-13, 17. On March 31, however, Dr. Turner was not deposed, no report had been issued, and, instead, the defense filed a withdrawal of its prior notice to rely on an insanity defense. Doc. 7-2 at 16; Doc. 7-1 at 55. In response, the prosecutor called an emergency hearing on March 31, 2016. Doc. 7-2 at 16.

During the emergency hearing, the court questioned defense counsel regarding Dr. Turner and defense counsel explained that Dr. Turner had not issued his report because, while he initially believed Petitioner was suffering from delirium at the time of the offense, after getting additional information he questioned that

initial opinion and also had no opinions on the basis of any such delirium.[6]  Doc. 7-2 at 20.  Also, defense counsel explained he had attempted to get expert testimony to support an insanity defense but was unable to do so, after speaking to "numerous other experts throughout the country."  Doc. 7-2 at 20.

Petitioner's claim that counsel abandoned a "viable" insanity defense is not supported by the record.  Counsel explored the defense but was not able to find an expert to support it.  Counsel cannot be deemed deficient for failing to raise a meritless defense.  *See e.g., United States v. Nyhuis*, 211 F.3d 1340, 1344 (11th Cir. 2000); *see also Miller v. Comm'r, Ala. Dep't of Corr.*, 826 F. App'x 743, 753 (11th Cir. 2020) ("Given that no medical expert could say that Mr. Miller was legally insane under Alabama law at the time of the murders, the Court of Criminal Appeals did not unreasonably conclude that his counsel's alleged errors with respect to the insanity defense did not prejudice him under *Strickland*.").

Regardless, even if counsel should have done more, Petitioner cannot show that counsel's withdrawal of the insanity defense was prejudicial.  As the Eleventh Circuit recently framed it, the question is whether Petitioner "can show a reasonable probability that a jury would have found by clear and convincing evidence that he met the insanity standard at the time of the charged offense[]."  *See Hayes v. Sec'y,*

---

[6] Petitioner argues counsel withdrew the insanity defense because the State refused to reschedule the deposition of Dr. Turner.  Doc. 11 at 4.  That, however, is not supported by the record.

*Fla. Dep't of Corr.*, 10 F.4th 1203, 1210 (11th Cir. 2021). By finding no prejudice, the circuit court answered that question negatively. The undersigned agrees.

There is simply nothing in the record to support an insanity defense. Neither Dr. Turner, Dr. Benson, or any other expert provided a report supporting an insanity defense. Thus, the record is devoid of any expert opinion showing that Petitioner suffered from a mental defect at the time of the incident which prevented him from knowing the consequences of his actions or the wrongfulness of his conduct. There was also no lay testimony even hinting at the possibility that Petitioner suffered from any mental defect at the time of the incident or that he did not know right from wrong. *See Hayes,* 10 F.4th at 1212 (citing *State v. Clark*, 745 So. 2d 1116, 1117 (Fla. 4th DCA 1999)) (lay testimony can create a jury issue regarding insanity).

The arriving officer, Officer Fountain, for example, testified Petitioner flagged him down, had his hands out the window, and said a gun was in his lap which needed to be removed. Doc. 7-3 at 52. Officer Fountain described Petitioner's demeanor as nervous, but calm. *Id.* at 55. Petitioner did everything the officer asked of him. *Id.* at 57. Once the officer placed Petitioner in the patrol car, he asked if Shine was going to be okay and began crying. *Id.* at 58. Petitioner's conduct at the time of the offense shows that he acted normally and calmly; it does not show that he suffered from a mental defect. Also, the prosecutor asked Petitioner's brother,

John, if he had any idea why the shooting occurred and he said "no, sir, I don't." *Id.* at 190.

Petitioner, himself, also failed to provide any testimony at trial that would have supported an insanity defense. To the contrary, when asked by counsel whether he was under the influence or impaired at the time of the shooting, Petitioner responded, "no, I don't believe so"; he also admitted he had smoked some marijuana that evening but denied being affected by it. Doc. 7-3 at 206. On cross-examination, Petitioner contended that "fear" was what was going on in his mind at the time. *Id.* at 223. Moreover, as the circuit court noted, even when given the opportunity to identify such a mental defect in the state post-conviction motion, Petitioner failed to do so (and, coincidentally, does not identify one now). Doc. 7-8 at 76.

Thus, the circuit's conclusion that Petitioner did not meet either prong of *Strickland* was not contrary to, and did not involve an unreasonable application of, clearly established Federal law, as determined by the Supreme Court. 28 U.S.C. § 2254(d). Petitioner is not entitled to relief on Ground One.

## B.    Ground Two: IATC for Failing to Request Jury Instruction on Self-Defense

Petitioner argues the facts in the case justified a self-defense instruction and counsel was deficient in failing to request such an instruction, or agreeing to one after the court asked counsel if he wanted to have one. The circuit court denied relief on this claim for two reasons. Doc. 7-8. First, as with the insanity defense, the

evidence simply did not support such a jury instruction. *Id.* at 78. Second, the decision not to seek the instruction was made after counsel consulted Petitioner *and* after the court specifically asked Petitioner if he agreed with counsel's decision. *Id.* at 78-79. Petitioner, thus, cannot now claim error. *Id.*

Under Florida law, "[i]n order to make a prima facie showing that he acted in self-defense, a defendant must demonstrate 'a real necessity for taking a life and a situation causing a reasonably prudent person to believe that danger is imminent.'" *Id.* at 77-78 (quoting *Dunn v. State,* 206 So.3d 802, 805 (Fla. 1st DCA 2016). Here, however, there was no evidence Shine had acted in a threatening manner toward Petitioner. To the contrary, Petitioner testified that when the two started toward his mom's house, Shine put on his seatbelt and laid back in the seat. Doc. 7-3 at 199. Petitioner did not even tell Shine where the two were going. *Id.* at 210.

Petitioner testified he pulled the gun out because he wanted Shine to comply, to scare him. *Id.* at 215. When Petitioner pulled out the gun, Shine had his hands in his pocket, and while Petitioner testified he thought Shine may have had a weapon, he had no explanation for this belief and further admitted that it was chilly that night, Shine had on a hoody, and Petitioner turned the heater on in the car. *Id.* at 198-201. Moreover, Petitioner admits Shine complied with Petitioner's requests to put his hands on the dash. *Id.* at 201-03, 218-19. And it was only when Shine hit the gun that it went off, according to Petitioner. *Id.* at 204.

Not only was there no evidence Shine posed a threat to Petitioner's life when the two were in the car, but, also, as the circuit court correctly concluded, Petitioner "offered no reasonable explanation why he believed his good friend masterminded a home-invasion robbery of his mother's home." Doc. 7-8 at 78. While Petitioner told 911 dispatchers his suspicions of Shine stemmed from Shine's gang affiliation, he testified on direct examination that he "wasn't sure if, …, that might have been the reason" Shine was involved with the alleged home invasion. Doc. 7-3 at 202.

Petitioner argues not requesting a jury instruction on self-defense was deficient because the prosecutor and defense counsel mentioned it in closing. He is wrong. The prosecutor argued in closing that Petitioner's testimony does not match the evidence in the case. *Id.* at 247. The prosecutor pointed out the physical evidence showed Shine was shot as he sat laid back in the passenger seat, facing forward. *Id.* at 251. Defense counsel also did not bring up self-defense in his closing. Instead, he told the jury Petitioner "pulled out his pistol because he thought it was necessary at the time because he didn't know what [Shine] was doing" – referring to Shine's act of putting his hands on the dash and then taking them off. *Id.* at 264. He described the shooting as "an accidental shooting." *Id.* at 265. He described Shine as Petitioner's "best buddy." *Id.* Neither the evidence presented, nor the statements made by defense counsel show that a situation existed in the car

that day that would have caused "a reasonably prudent person to believe that danger is imminent."

As stated above, counsel cannot be deficient for making a meritless argument, and any attempt to seek a jury instruction on self-defense would have been futile. Petitioner is not entitled to relief on this ground.

## C.    Ground Three: IATC for Failing to File a Motion for New Trial Based on Prosecutor Shifting the Burden of Proof During Closing Argument

Petitioner takes issue with statements the prosecutor made during closing arguments about what Petitioner said and did not say on the 911 calls, which Petitioner contends shifted the burden of proof and misstated the evidence.   In Ground Three, Petitioner contends counsel was ineffective for not moving for a new trial based on this alleged misconduct.  Doc. 1 at 18.  While Petitioner raised a similar issue with the state court as Ground Four of his Amended Rule 3.850 Motion, he did so only in terms of whether counsel should have objected at trial,[7] not whether counsel should have moved for a new trial.  Doc. 7-8 at 62.  Therefore, Ground Three should be dismissed as unexhausted.

Issues raised in a federal petition for a writ of habeas corpus must first have been fairly presented in the state courts and thereby exhausted. *See Anderson v.*

---

[7] Petitioner raises this specific IATC claim as part of Ground Six in his federal petition, discussed below.

*Harless,* 459 U.S. 4 (1982); *Hutchins v. Wainwright,* 715 F.2d 512 (11th Cir. 1983).

"When a federal habeas petitioner raises a claim previously presented in the state courts, but bases the habeas corpus claim upon new factual allegations, new legal theories, or materially different evidence than was presented to the state courts, then the claim has not been fairly presented in the state courts and the petitioner has failed to exhaust his state remedies in accordance with § 2254." *Mack v. Singletary,* 142 F. Supp. 2d 1369, 1374–75 (S.D. Fla.), *aff'd sub nom. Mack v. Sec. for Dep't of Corr.*, 273 F.3d 1111 (11th Cir. 2001) (citing *Givens v. Green,* 12 F.3d 1041 (11th Cir. 1994)).

Moreover, Petitioner cannot now return to state court to assert and exhaust this claim. *See* Fla. R. Crim. P. 3.850 (barring a successive motion unless an exception applied); *see also, Spencer v. Sec'y, Dep't of Corr.*, 609 F.3d 1170, 1179 (11th Cir. 2010) ("substantive claims of prosecutorial misconduct could and should have been raised on direct appeal and thus are procedurally barred from consideration in a postconviction motion"). Since Petitioner's opportunity to pursue these claims has concluded, the claims are procedurally barred. *Martin v. Sec'y, Dept. of Corr.*, 262 F. App'x 990, 993 (11th Cir. 2008) ("If the petitioner never raised the claim in state court, and it is obvious that the unexhausted claim would be procedurally barred in state court, 'the exhaustion requirement and procedural default principles combine to mandate dismissal.'") (quoting *Bailey v. Nagle*, 172

F.3d 1299, 1303 (11th Cir. 1999)). Although a procedural default may be excused upon a showing of "cause and prejudice" or a fundamental miscarriage of justice, Petitioner does not argue either in the petition or the reply. *Murray v. Carrier*, 477 U.S. 478, 496 (1986). Thus, Petitioner is not entitled to relief on Ground Three.

### D.    Ground Four: IATC for Failing to Introduce Two Photos During Trial

Petitioner argues counsel was ineffective for not introducing at trial certain photos of Shine showing his hands out of his pockets to rebut the prosecutor's argument in closing that Shine had his hands in his jacket and so could not have hit or tried to grab the firearm. Doc. 1 at 21.

During rebuttal closing, the prosecutor argued the position of Shine's arms in two photos admitted as evidence at trial showed he was not swatting at the firearm: "Take a look at the pictures. The only skin showing is his face and his right hand. His left hand is in his coat. His left hand is in his coat. It's not swatting at the firearm." Doc. 7-3 at 272. Defense counsel objected that the prosecutor was misstating the evidence, but the court overruled the objection. *Id.* at 271-72. The prosecutor continued, "Look at the pictures yourself, folks. They are in evidence, just like defense counsel said. You take them back, and you look at them." *Id.* at 272.

In a subsequent hearing on a motion for a new trial, defense counsel pointed out that, in the two photos introduced at trial, the decedent's hands were not visible.

Doc. 7-1 at 119.  Defense counsel then produced two photographs that were provided in discovery but not introduced at trial which "clearly show that Mr. Shine's hand is not in his pocket and is lying on the seat of the car next to his left leg." *Id.* at 119-20.  Petitioner argues that, had counsel introduced those two photos at trial, "this would have supported Petitioner's theory of defense and at the same time undermined the State's case in chief of the shooting being in cold blood."  Doc. 1 at 22.

The circuit court denied relief on this claim because Petitioner failed to establish either deficient performance or prejudice under *Strickland*.  Even if the photographs had been admitted, they would not have rebutted the evidence showing Petitioner shot the victim "at almost point-blank range looking straight ahead, and not, as Defendant contends, struggling over the gun."  Doc. 7-8 at 82-83.  The court's conclusion was not contrary to, and did not involve an unreasonable application of, clearly established Federal law, as determined by the Supreme Court.  28 U.S.C. § 2254(d).

First, the undersigned agrees Petitioner has not shown prejudice under *Strickland* because even if the photos had been admitted at trial, there is no reasonability probability of a different outcome.  While the photographs would have shown Shine's hands were not in his pocket, the evidence refuting Petitioner's "accidental discharge" testimony was not dependent on whether Shine's hands were

or were not in his pockets.  Instead, they came from (1) the testimony of the experts showing, based on the trajectory of the bullet, that Shine was laid back in the passenger seat looking forward and (2) the medical examiner's testimony that the gun was less than two inches from the decedent's head, and not at arm's length as would be the case if the victim were attempting to knock the gun away.

Second, the circuit court was not unreasonable in finding counsel did not perform deficiently in failing to predict that the prosecutor would misstate the evidence in rebuttal argument.  "The test for ineffectiveness is not whether counsel could have done more; perfection is not required." *Waters v. Thomas*, 46 F.3d 1506, 1518 (11th Cir. 1995) (en banc). "A lawyer can almost always do something more in every case.  But the Constitution requires a good deal less than maximum performance." *Atkins v. Singletary*, 965 F.2d 952, 960 (11th Cir. 1992).  Deficient performance "has nothing to do with what the best lawyers would have done.  Nor is the test even what most good lawyers would have done.  We ask only whether some reasonable lawyer . . . could have acted, in the circumstances, as defense counsel acted." *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995) (en banc) (internal citations omitted).  Petitioner is therefore not entitled to relief on this ground.

E.      **Ground Five:  Trial Court Error in Denying Judgment of Acquittal as Insufficient Evidence Existed to Sustain Conviction of Second-Degree Murder.**

Petitioner argues the trial court violated the Sixth and Fourteenth Amendments of the United States Constitution by denying his motion for judgment of acquittal.  In that motion, Petitioner argued there was a lack of substantial evidence to support a second-degree murder conviction because the evidence showed he harbored no ill will, hatred, spite, or evil intent towards the victim.  Doc. 1 at 24.  Respondent argues Petitioner failed to fairly present this claim as a federal claim in state court and so has failed to exhaust it.  Doc. 7 at 32.  The undersigned agrees Petitioner failed to exhaust this claim.

To exhaust a federal claim, a habeas petitioner must have fairly presented the claim in each appropriate state court and alert that court to the *federal* nature of the claim.  *Picard v. Connor*, 404 U.S. 270, 275-76 (1971).  A petitioner can "indicate the federal basis for his claim" by citing the federal source of law in conjunction with the state law claim, citing a case deciding such a claim on federal grounds, or simply labeling the claim as "federal." *Baldwin v. Reese*, 541 U.S. 27, 32 (2004).

Petitioner raised a similar issue in his direct appeal but failed to present the issue as based on federal law.  Doc. 7-4 at 36-45.  Instead, Petitioner relied only on Florida state statutes and case law and did not mention a violation of federal law, or cite federal case law, constitutional provisions or statutes in the initial brief.

Specifically, he never mentioned the federal standard in gauging the legal sufficiency of the evidence on which a conviction is based, from *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) ("[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."). Petitioner thus failed to fairly present Ground Five as a federal claim in state court.

Petitioner cannot now return to state court to assert and exhaust this claim. *See* Fla. R. App. P. 9.140(b)(3) (permitting appeal at any time between rendition of a final judgment and 30 days following rendition of a written order imposing sentence.). Since Petitioner cannot file a second direct appeal of his judgment and sentence, this claim is procedurally barred. *Martin*, 262 F. App'x at 993. Moreover, Petitioner has not made factual allegations demonstrating "cause for" and "actual prejudice from the default," *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977), or his "actual innocence" as contemplated in *Murray v. Carrier*, 477 U.S. 478, 496 (1986) to overcome the procedural bar. Therefore, Petitioner is not entitled to habeas relief on Ground Five.

### F.    Ground Six:  Prosecutorial Misconduct and IATC by allowing Prosecutorial Misconduct During Closing Argument

In Ground Six, Petitioner argues the prosecutor engaged in misconduct during his closing arguments and also claims that counsel was ineffective for failing to object to such misstatements. Doc. 1 at 26. As discussed below, the prosecutorial

misconduct claims are procedurally defaulted, two of the IATC claims are exhausted but do not entitle Petitioner to habeas relief, and the third IATC claim was not exhausted and that lack of exhaustion is not excused by *Martinez v. Ryan*, 566 U.S. 1 (2012).

First, the prosecutorial misconduct claims were not exhausted and are now procedurally barred.  As discussed regarding Ground Five, to exhaust a federal claim, a habeas petitioner must have fairly presented the claim in each appropriate state court and alert that court to the *federal* nature of the claim.  *Picard*, 404 U.S. at 275-76.  A petitioner can "indicate the federal basis for his claim" by citing the federal source of law in conjunction with the state law claim, citing a case deciding such a claim on federal grounds, or simply labeling the claim as "federal." *Baldwin*, 541 U.S. at 32. While Petitioner raised the prosecutorial misconduct claims as part of Issue I on direct appeal, Doc. 7-4 at 28-34, Petitioner cited and relied only upon state law in arguing Issue I on direct appeal.  Therefore, the prosecutorial misconduct claims were not fairly presented as *federal* claims and are unexhausted.  Also, since Petitioner cannot now return to state court and exhaust them, they are procedurally barred.[8]

---

[8] As noted above, Petitioner makes no arguments regarding cause and prejudice for the default or application of the miscarriage of justice exception.

As to the claim that counsel was ineffective for failing to object to the prosecutor's comments, Petitioner acknowledges that he failed to completely exhaust his state remedies on claims covering all the comments he complains of in his federal petition. Doc. 1 at 34. In the Petition he argues counsel should have objected during closing to three comments by the prosecutor: (1) the prosecutor's alleged shifting of the burden by commenting that Petitioner never called the shooting an accident during the 911 call; (2) the prosecutor's argument that Petitioner was just trying to set up his defense during the 911 calls and planned to place the body at his mother's house, even though it was the mother who first called Petitioner about her backdoor alarm; and (3) the prosecutor's submission of two photos to the jury and comment that they showed his hands were in his pockets and not swatting at a gun as Petitioner claimed, when other photos showed his hand was not in his pocket.[9] Doc. 1 at 32-33. While Petitioner exhausted the first two grounds of IATC, he did not exhaust the third. The undersigned, therefore, will address the first two on the merits, and finds the third is procedurally defaulted.[10]

---

[9] In Ground Four, *supra*, Petitioner argues IATC for failing to move to admit into evidence two photos showing Shine's hands were not in his pockets.

[10] Petitioner argues the procedural default should be excused under *Martinez v. Ryan*, 566 U.S. 1 (2012). In *Martinez*, the Supreme Court held that a petitioner may establish cause for the default of a claim of ineffective assistance of trial counsel where (1) "in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective," and (2) the defaulted claim is a "substantial one," meaning that "the claim has some merit." *Martinez*, 566 U.S. at 14, 17. For the same reasons set forth in Ground Four, however, the Court finds Petitioner's IATC for failure to object to the prosecutor's comments about the location of Shine's hands is not

In the closing argument, the prosecutor played the 911 tapes again for the jury and explained as follows:

> We showed, within three minutes two phone calls were made. We know at the first one, Skky Shine is alive, begging for his life, "Please don't shoot me, man." We know in the second one, there's no more talk. In the second one, Terrance Soles starts spinning the story about his mother being in danger. He doesn't say anything about "This was an accident; I accidentally shot my friend." No, he's setting up his defense. He is going to the house. He is going to put the body there, but the police get there first. So now it's a different story. It's an accident.

Doc. 7-3 at 246. Petitioner argues the remarks about Petitioner not telling the dispatcher that the shooting was an accident and that the second call was "setting up his defense" shifted the burden to Petitioner to show that he was not guilty. Doc. 1 at 18. Petitioner further argues by making these statements, the prosecutor "led the jury to believe that defendant created a false perception of thought of his mother being in danger only to set-up a defense for the act of murder in which he had already committed and he (defendant) was going to the house to put the body there." However, Shine was still alive when the calls were made, which the prosecutor knew. Doc. 1 at 27.

The circuit court denied relief, finding no prejudice in counsel's failure to object because the State's argument was brief and limited and, thus "did not have

---

a substantial claim. Also, the record shows that counsel did object to that comment, and the objection was overruled. Doc. 73 at 271-72.

the effect of vitiating the entire trial proceedings." Doc. 7-8 at 81. The circuit court's conclusion was not unreasonable.

First, as the circuit court pointed out, the disputed part of the closing was a very limited part of the State's closing argument. Second, the disputed comments did not improperly shift the burden of proof to Petitioner. The prosecutor was not commenting on Petitioner's failure to produce evidence at trial. Instead, the prosecutor was pointing out that what Petitioner did not say during the 911 calls is telling of what actually transpired. *See Williams v. Jones*, 2017 WL 11547849, at *5 (S.D. Fla. Aug. 28, 2017) (if "statements by the prosecutor, taken in the context of which they were made, had nothing to do with Petitioner's burden of proof," they are not impermissible burden-shifting), *report and recommendation adopted,* 2018 WL 11000697 (S.D. Fla. Mar. 28, 2018). Third, the trial judge instructed the jury on the state's burden of proof and reminded them, "The defendant is not required to present evidence or prove anything." Doc. 7-1 at 96.

Moreover, the prosecutor did not misstate the evidence. Instead, as he is allowed to do, the prosecutor drew reasonable inferences from the evidence – that inference being that Petitioner was intending to kill Shine, make it sound like it was because of a home invasion, and take Shine's body to his mom's house. *See Johnson v. State,* 238 So. 3d 726, 739 (Fla. 2018) ("Prosecutors have wide latitude in closing argument "to review the evidence and to explicate those inferences which may

reasonably be drawn from the evidence."). Whether he shot Shine before or after he placed the second 911 call is not relevant. Thus, any objection by counsel would have been without merit.

And, regardless, there was no prejudice even if there had been error because, at the outset of the trial, the trial judge reminded the jurors that "What the lawyers say is not evidence and you are not to consider it as such." Doc. 7-3 at 17. Then, at the beginning of closing argument, the judge repeated that admonition, "Please remember that what the attorneys say is not evidence." *Id.* at 241. The Supreme Court and Eleventh Circuit "have often held that we must presume that juries follow their instructions to disregard specific remarks." *Hammond v. Hall*, 586 F.3d 1289, 1334 (11th Cir. 2009) (citing *CSX Transp., Inc. v. Hensley*, 556 U.S. 838 (2009) ("The jury system is premised on the idea that rationality and careful regard for the court's instructions will confine and exclude jurors' raw emotions. Jurors routinely serve as impartial factfinders in cases that involve sensitive, even life-and-death matters. In those cases, as in all cases, juries are presumed to follow the court's instructions."); *Greer v. Miller*, 483 U.S. 756, 767 n.8 (1987) ("We normally presume that a jury will follow an instruction"); *United States v. Stone*, 9 F.3d 934, 938 (11th Cir. 1993) (collecting cases)).

### G.    Ground Seven: IATC for Cumulative Effect of Counsel's Errors

Petitioner alleges that cumulative error based on the instances of ineffective assistance of counsel violated his Sixth and Fourteenth Amendment rights under the U.S. Constitution.   Doc. 1 at 35.   The circuit court denied relief because the "individual claims are meritless or otherwise barred."   Doc. 7-8 at 83.   This conclusion was not contrary to, and did not involve an unreasonable application of, clearly established Federal law, as determined by the Supreme Court.   28 U.S.C. § 2254(d).   The "cumulative error analysis should evaluate only matters determined to be in error, not the cumulative effect of non-errors."   *Ballard v. McNeil*, 4:08cv347-SPM/EMT, 785 F. Supp. 2d 1299, 1336 (N.D. Fla. 2011) (citing *United States v. Barshov,* 733 F.2d 842, 852 (11th Cir.1984)) ("Without harmful errors, there can be no cumulative effect compelling reversal.").

## IV.    CONCLUSION

### A.    Evidentiary Hearing

The undersigned finds that an evidentiary hearing is not warranted.   In deciding whether to grant an evidentiary hearing, this Court must consider "whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief."   *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007).   Additionally, this Court must take into account the deferential standards prescribed by § 2254. *See id.*  Upon consideration,

the undersigned finds that the claims in this case can be resolved without an evidentiary hearing. *See Schriro*, 550 U.S. at 574.

## B.   Certificate of Appealability

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Court provides: "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." If a certificate is issued, "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." 28 U.S.C. § 2254 Rule 11(a). A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. 28 U.S.C. § 2254 Rule 11(b).

After review of the record, the Court finds no substantial showing of the denial of a constitutional right. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000) (explaining how to satisfy this showing) (citation omitted). Therefore, it is also recommended that the district court deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides: "[B]efore entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." Rule 11(a), Rules Governing 2254 Cases. If there is an objection to this recommendation by either party, that party may bring such argument to the

attention of the district judge in the objections permitted to this Report and Recommendation.

Accordingly, it is respectfully RECOMMENDED:

1.      That the petition under 28 U.S.C. § 2254, challenging the conviction in *State v. Soles*, 2014 CF 4998 in the First Judicial Circuit Court for Escambia County, Doc. 1, be DENIED without an evidentiary hearing.

2.      That a certificate of appealability be DENIED.

3.      That the clerk be directed to close the file.

At Pensacola, Florida, this 17th day of January, 2024.

*/s/ Hope Thai Cannon*

**HOPE THAI CANNON**
**UNITED STATES MAGISTRATE JUDGE**


NOTICE TO THE PARTIES

Objections to these proposed findings and recommendations must be filed **within fourteen (14) days** of the date of the Report and Recommendation. Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control. An objecting party must serve a copy of its objections upon all other parties. A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.